**TDS METROCOM, LLC, Plaintiff,**

v.

**Burneatta BRIDGE, Robert M. Garvin and Mark Meyer, in Their Capacity as Commissioners of the Public Service Commission of Wisconsin and Not as Individuals,**

and

**Wisconsin Bell, Inc., d/b/a SBC Wisconsin, Defendants.**

No. 05–C–101–C.

United States District Court,
W.D. Wisconsin.

Sept. 19, 2005.

Peter Gardon, Reinhart Boerner Van-Deuren S.C., Madison, WI, for Plaintiff.

Michael Varda, Public Service Commission Assistant General Counsel, Jordan J. Hemaidan, Michael Best & Friedrich, LLP, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory and injunctive relief under the Telecommunications Act of 1996. Plaintiff TDS Metrocom, LLC seeks judicial review of a decision by defendant commissioners of the Public Service Commission of Wisconsin concerning rates that defendant Wisconsin Bell, Inc., d/b/a SBC Wisconsin, may charge plaintiff and other competitors for use of certain portions of defendant SBC's local telephone network. Plaintiff contends that the rates set by the commission do not comply with the Act or its implementing regulations, that the commission acted arbitrarily and capriciously by not explaining its reasons for choosing certain rate components and that the commission erred by declining to address the anticompetitive effects of its decision. Subject matter jurisdiction is present. 47 U.S.C. § 252(e)(6); 28 U.S.C. § 1331.

The origin of this case dates back to December 1999, when the Public Service Commission initiated an investigation to determine the rates defendant SBC could charge for elements of its network. On March 22, 2002, the commission issued an opinion in which it adopted cost study methods for determining the appropriate rates and ordered defendant SBC and its competitors to conduct cost studies in accordance with the method set out in the opinion. *Final Decision,* Docket No. 6720–TI–161, 2002 WL 31127500 (Mar. 22, 2002) (hereafter *UNE I Final Decision* ). On July 9, 2003, the commission issued a second opinion in which it set rates with respect to a number of defendant SBC's network elements. *UNE Compliance Order,* Docket No. 6720–TI–161, 2003 WL 21659235 (July 9, 2003).[1] In early 2004,

---

1. In an opinion and order dated August 26, 2004, this court vacated the *UNE Compliance Order* in part and remanded the matter to the commission for further proceedings. *Wisconsin Bell, Inc. v. Bridge,* 334 F.Supp.2d 1127 (W.D.Wis.2004).

the Wisconsin legislature enacted Wis. Stat. § 196.197, which imposes deadlines on the commission for ruling on petitions filed by telecommunications providers to determinate rates for unbundled network elements. The commission must rule within 180 or 270 days of certifying a petition as complete, depending on the number of rates at issue. On March 12, 2004, shortly after § 196.197 went into effect, defendant SBC filed a petition to determine new rates for nine types of unbundled loops. (Loops are the wires that connect a customer's premises to a carrier's central office, where switches route calls to their destinations. *Competitive Telecommunications Ass'n v. FCC*, 309 F.3d 8, 10 (D.C.Cir.2002); *see also Michigan Bell Telephone Co. v. Strand*, 305 F.3d 580, 583 (6th Cir.2002)). Following a hearing and a round of briefing, the commission issued a decision on October 13, 2004 in which it set 27 rates that defendant SBC may charge competitors for access to its unbundled loops. *Final Decision*, Docket No. 6720–TI–187, 2004 WL 2590632 (Oct. 13, 2004) (hereafter *UNE II Final Decision*). As a general matter, the rates promulgated in the *UNE II Final Decision* are higher than those set in the *UNE I Final Decision*. Plaintiff seeks judicial review of the rates established in the *UNE II Final Decision*.

For the reasons stated below, I conclude that the commission's decisions with respect to each of the rate components challenged by plaintiff are consistent with federal law and supported by substantial evidence. Because rate-making is an exercise that requires a high level of technical expertise, only egregious errors by an agency will justify judicial intervention. Plaintiff has not shown that the Public Service Commission erred, much less that its errors resulted in rates that are arbitrary and capricious. As the text of the *UNE II Final Decision* indicates, the commission considered the arguments and proposals put forth by the parties and offered reasoned explanations for its decisions with respect to each of the challenged rate components. Each of its decisions is supported by substantial evidence in the record. In addition, the commission acted reasonably in declining to address the issue whether the rates adopted in the *UNE II Final Decision* would result in an unlawful price squeeze. Therefore, the *UNE II Final Decision* will be affirmed in its entirety.

## A. Background

Congress passed the Telecommunications Act of 1996 in part to promote competition in local telephone service markets. *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 638, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). The Act fosters competition by requiring an incumbent local exchange carrier to provide access to its network and facilities to new entrants to the market, known as competitive local exchange carriers. (The "local exchange" consists of the facilities and equipment needed to connect "terminals like telephones, faxes, and modems to other terminals within a geographical area like a city." *Verizon Communications Inc. v. FCC*, 535 U.S. 467, 489, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002).) One of the ways an incumbent must provide access to its network is by leasing elements of the network on an unbundled basis to competitors at "rates, terms, and conditions that are just, reasonable and nondiscriminatory." 47 U.S.C. § 251(c)(3); *SBC Communications Inc. v. FCC*, 407 F.3d 1223, 1225 (D.C.Cir.2005). The rates an incumbent may charge for access to unbundled network elements (UNEs) may be set by private agreement, 47 U.S.C. § 252(a), or if the incumbent and competitors cannot agree, by state commissions, 47 U.S.C. § 252(b).

In determining the rate for a specific element, carriers and state commissions must abide by federal law and applicable regulations and orders issued by the Federal Communications Commission. The FCC has chosen to define the "cost" of an element (and thus the rate an incumbent may charge for access to that element) in terms of the element's "forward-looking economic cost." 47 C.F.R. § 51.505. Accordingly, the rates for unbundled network elements are determined "pursuant to the forward-looking economic cost-based pricing methodology set forth in [47 C.F.R.] §§ 51.505 and 51.511." 47 C.F.R. § 51.503(1). This method is known as the total element long run incremental cost method. 47 C.F.R. § 51.505(b). (Although this method is known in the industry by the acronym TELRIC, use of acronyms is difficult for ordinary readers to keep straight; I will refer to this method in some instances as the "total element" method for brevity.) The total element method is "based upon the cost of operating a hypothetical network built with the most efficient technology available." *AT & T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 375 n. 3, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). It is designed to produce rates for unbundled network elements that reflect what an incumbent would be able to charge in a competitive market. *In re Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 2003 WL 22175730, 18 F.C.C.R. 16,978, at ¶ 669 (2003) ("*Triennial Review Order*"). In accordance with these principles, the cost of an unbundled network element is measured on the basis of "the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent [local exchange carrier's] wire centers." 47 C.F.R. § 51.505(b)(1). An incumbent carrier's embedded costs, retail costs, opportunity costs and revenues used to subsidize other services may not be considered in determining an element's forward looking economic cost. § 51.505(d)(1)-(4).

Application of the total element method is not meant to produce uniform rates for unbundled network elements across the country. State commissions "retain flexibility to consider 'local technological, environmental, regulatory, and economic conditions.'" *AT&T Corp. v. FCC*, 220 F.3d 607, 615 (D.C.Cir.2000) (citations omitted). As one court has noted, "TELRIC is not a single rate but a ratemaking methodology that may yield a rather broad range of rates." *WorldCom, Inc. v. FCC*, 308 F.3d 1, 7 (D.C.Cir.2002).

### B. *Standard of Review*

When reviewing the decision of a state commission, a district court's inquiry is limited to determining whether the rates set by the commission comply with the requirements of 47 U.S.C. §§ 251–252. *Indiana Bell Telephone Co., Inc. v. McCarty*, 362 F.3d 378, 383 (7th Cir.2004). The court reviews de novo a state commission's interpretation of the Telecommunications Act and the FCC's implementing regulations and orders. *Id.* at 385; *Southwestern Bell Telephone Co. v. Apple*, 309 F.3d 713, 717 (10th Cir.2002). However, because the commission has a substantial body of expertise in the area of rate-setting and because of the flexibility built into the total element method, the commission's factual findings and other conclusions are reviewed under an arbitrary and capricious standard. *Indiana Bell*, 362 F.3d at 385; *Southwestern Bell*, 309 F.3d at 717–18; *MCI Telecommunications Corp. v. BellSouth Telecommunications, Inc.*, 112 F.Supp.2d 1286, 1290–91 (N.D.Fla.2000). Under this standard, the commission's decision is presumed valid and must be upheld if "it is the result of a deliberate

principled reasoning process, and if it is supported by substantial evidence." *Michigan Bell Telephone Co. v. Strand,* 305 F.3d 580, 587 (6th Cir.2002); *see also Illinois Bell Telephone Co. v. Wright,* 245 F.Supp.2d 900, 905 (N.D.Ill.2003). This deferential standard of review prevents the court from re-weighing the evidence that was presented to the commission, making credibility determinations or substituting its own judgment for the commission's. *GTE South, Inc. v. Morrison,* 199 F.3d 733, 746 (4th Cir.1999); *Illinois Bell,* 245 F.Supp.2d at 905.

Plaintiff challenges the commission's decisions with respect to five components that are plugged into cost models to calculate the rates defendant SBC may charge for access to its unbundled loops: (1) the ratio of integrated digital loop carrier to universal digital loop carrier; (2) fill factors; (3) installation costs; (4) cost of equity; and (5) depreciation rates. The Court of Appeals for the Seventh Circuit has suggested that the Telecommunications Act does not empower federal courts to examine the propriety of individual rate components. *AT&T Communications of Illinois, Inc. v. Illinois Bell Telephone Co.,* 349 F.3d 402, 408 (7th Cir.2003) ("Congress provided for federal judicial review of *rates* set by state commissions; it did not provide for review of individual factors that influence those rates.") (emphasis in original). However, in *Wisconsin Bell,* 334 F.Supp.2d at 1136, I concluded that "a court cannot give meaningful review to a rate without looking at the factors that affect the rate." Because courts lack the technical expertise to conduct an in-depth analysis of rate components, a deferential standard of review of the commission's choice of rate components is appropriate. The question with respect to each challenged component is whether plaintiff can show that defendant commissioners erred in calculating one or more of them and

that this error is so substantial it renders the rates established by the commission arbitrary and capricious. *Id.*

### C. *Propriety of UNE II Proceeding*

Although it does not raise it as a separate argument, plaintiff grumbles about the fact that the commission revised defendant SBC's rates in the *UNE II Final Decision* mere months after the rates established in the *UNE I Final Decision* went into effect. However, there was nothing untoward about the commission's decision to re-examine defendant's rates. As it noted, the tight deadlines imposed by newly-enacted Wis. Stat. § 196.197 signaled "the legislature's concern that UNE rates must be made without 'regulatory lag' to keep rates current with competitive market conditions." *UNE II Final Decision,* at 14, 2004 WL 2590632. Moreover, re-examination of defendant's rates was appropriate in light of changes in federal law concerning unbundled network element pricing that occurred after the *UNE I Final Decision* and a more complete factual record based on current data. *Id.* at 15, 2002 WL 31127500.

### D. *Rate Components*

#### 1. *Integrated digital loop carrier/universal digital loop carrier ratio*

Digital loop carrier systems are electronic devices that allow telephone service providers to serve large numbers of subscribers efficiently. Before the advent of such systems, service providers had to run copper wire from their central offices to each of their subscribers. Digital loop carrier systems allow the companies to run lines over much shorter distances. Typically, a carrier is placed in a location central to a number of subscribers, and copper lines are run over the relatively short distances from the carrier to the subscribers. The digital loop carrier system converts the analog signals emanating from

the subscriber's telephone to digital signals that travel to the central office and it performs the reverse process on signals traveling from the central office to individual subscribers. *DSC Communications Corp. v. Pulse Communications, Inc.,* 170 F.3d 1354, 1357–58 (Fed.Cir.1999).

There are two main types of digital loop carrier systems: universal digital loop carrier and integrated digital loop carrier. In the *UNE I Final Decision,* the commission assumed that a forward-looking, efficient network would contain 50% universal digital loop carrier and 50% integrated digital loop carrier. In the UNE II proceeding, defendant SBC proposed a 5% integrated/95% universal split; the competitive carriers proposed an assumption of 100% integrated digital loop carrier. The commission retained the 50/50 ratio in the *UNE II Final Decision.* It noted that each type of digital loop carrier has advantages over the other. Universal digital loop carrier costs less to install and allows for easier transfer of individual loops to a competitor; integrated digital loop carrier, although "inefficient for the provision of individual [network elements]," is more efficient to operate because

> there is no need to split out individual loops and convert them to analog electrical signals prior to connecting to the switch, which then converts the signals back to digital. This allows for a much greater concentration of loops and increases the carrying capacity of the fibers while lowering the investment in electronic equipment in the central office terminal.

*UNE II Final Decision,* at 22, 2004 WL 2590632. Therefore, the commission concluded that

> A network with a significant portion of both types of [digital loop carrier] will allow SBC to use the most efficient and therefore [total element method]-compli-

ant technology on its routes that have the greatest volume, while also accommodating its mandate to provide [competitive local exchange carriers] with access to individual loops and to provide loops for DSL and other services that do not use the switch.

*Id.* at 23, 2004 WL 2590632.

Plaintiff argues that the commission's assumption was an erroneous interpretation of federal law because the FCC has determined that "the use of [universal digital loop carrier] in developing unbundled loop costs is inconsistent with [the total element method]." TDS's Br., dkt. # 14, at 33. For support, plaintiff cites *In re Petition of WorldCom, Inc.,* 2003 WL 22038242, 18 F.C.C.R. 17,722 (2003) ("*Virginia Arbitration Order* "), in which the Wireline Competition Bureau, a subdivision of the FCC, stepped into the shoes of the Virginia State Corporation Commission to arbitrate an interconnection agreement dispute. 47 U.S.C. § 252(e)(5) (granting FCC authority to take place of state commission that fails to carry out arbitration). In that proceeding, the Wireline Competition Bureau concluded that "a [total element method] model should use 100 percent NGDLC [Next Generation Digital Loop Carrier] systems and should not assume any [universal digital loop carrier] systems." *Virginia Arbitration Order* at ¶ 312, 2003 WL 22038242. (According to plaintiff, next generation digital loop carrier and integrated digital loop carrier are equivalent.) Plaintiff argues that this court is bound by the Bureau's conclusion. *See also* Indiana Utility Regulatory Commission, *In re Indiana Bell Telephone Company,* 2004 WL 513743, at *41 (Jan. 5, 2004) ("We also direct that LoopCAT assume 100% [integrated digital loop carrier] technology. We agree with the FCC Wireline Competition Bureau, that the use of [universal digital loop carrier] in devel-

oping unbundled loop costs is inconsistent with [the total element method].").

Defendants argue that the Wireline Competition Bureau's conclusion is not binding on the court because it rests on the factual record developed in the Virginia arbitration proceeding. Defendant SBC cites several FCC decisions predating the *Virginia Arbitration Order* in which the commission concluded that it was not feasible to unbundle loops from integrated digital loop carrier and argues that the competitive carriers presented no evidence to the commission suggesting that technology exists currently to unbundle integrated digital loop carrier systems. SBC's Br., dkt. # 18, at 34–35. Defendant commissioners maintain that the ratio of integrated to universal digital loop carrier in a total element method-compliant network is "exactly [the] kind of technology determination a state commission makes," Commissioners Br., dkt. # 17, at 29, and that their decision to adopt a 50/50 split is supported by substantial evidence.

At least one court has treated as binding the conclusion in the *Virginia Arbitration Order* that a total element method-compliant network must feature 100% integrated digital loop carrier. *MPower Communications Corp. v. Hurley,* 381 F.Supp.2d 738, 756 (N.D.Ill.2005). Moreover, the Court of Appeals for the Seventh Circuit has deferred to the *Virginia Arbitration Order* insofar as it represents the FCC's interpretation of its own rules. *Indiana Bell,* 362 F.3d at 386. Nonetheless, I am not convinced that the 100% integrated digital loop carrier assumption is binding on this court or entitled to deference. The Wireline Competition Bureau concluded that loops in an integrated digital loop carrier system could feasibly be unbundled with currently available technology because the record in the Virginia proceeding dictated that conclusion:

> We find that the record demonstrates that it is technically feasible to unbundle [next generation digital loop carrier] loops, and that this technology is currently available. Although both sides introduced voluminous record evidence in the cost portion of the arbitration, the evidence is conflicting and ultimately unpersuasive. The most revealing information on this issue comes from Verizon's testimony in the non-cost portion of the arbitration. There, a Verizon witness admitted that Verizon has had the technical ability to provide unbundled [next generation digital loop carrier] loops for four to five years but chose not to implement a standard offering because competitive carriers had not sufficiently pursued such an offering.

*Virginia Arbitration Order* at ¶ 315, 2003 WL 22038242. In light of this admission, the Wireline Competition Bureau concluded that Verizon, the incumbent, had failed to satisfy its burden of proving that it was not feasible to unbundle next generation loops. *Id.* at ¶ 314, 2003 WL 22038242. This suggests that the Bureau's conclusion did not turn on an interpretation of the Telecommunications Act or the FCC's implementing regulations to which this court would owe deference. On the contrary, the availability of technology needed to unbundle integrated digital loop carrier loops appears to be a question of fact. Therefore, the Bureau's conclusion on this point is not binding or entitled to deference.

■  The proper inquiry is whether the commission's decision to adopt a 50/50 split between integrated and universal digital loop carrier is arbitrary and capricious. Plaintiff argues that the commission acted arbitrarily and capriciously by failing to explain its decision to retain the 50/50 split it adopted in the *UNE I Final Decision.* The commission heard conflicting testimo-

ny about the percentages of integrated and universal digital loop carrier that should be incorporated into the cost study. R.56: 1251, 1578–79. Also, experts representing the defendant SBC and the competitive carriers gave conflicting testimony concerning the feasibility of unbundling loops served by integrated digital loop carrier systems. R.56: 1252–54; R.57: 680–81. Ultimately, the commission concluded that a 100% integrated digital loop carrier assumption was not appropriate for a forward-looking network. As defendant commissioners note, the testimony of Gordon Fletcher and James Smallwood supports this conclusion. Rather than accept defendant SBC's 5% integrated/95% universal proposal, however, the commission chose a 50/50 ratio that balances the efficiency of using integrated digital loop carrier on high volume feeder routes with the commission's conclusion that providing access to individual loops is easier with universal digital loop carrier. What is important for the purpose of this review is that the commission considered the arguments of both sides, arrived at a conclusion that is supported by evidence in the record and gave an adequate explanation for its conclusion. Its decision regarding the ratio of integrated to universal digital loop carrier is not arbitrary and capricious.

### 2. Fill factors

Plaintiff challenges the commission's adoption of three fill factors in the *UNE II Final Decision*. Fill factors are "estimates of the proportion of a facility that will be 'filled' with network usage." *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 1996 WL 452885, 11 F.C.C.R. 15,-499, ¶ 682 (1996) ("*Local Competition Order*"). Incumbent carriers build excess capacity into their networks that can be ready to provide service to new customers, for testing and repairs or for use in case of equipment failure. *AT&T Communications of Illinois, Inc. v. Illinois Bell Telephone Co.*, 349 F.3d 402, 405 (7th Cir. 2003). They recover the costs of maintaining this excess capacity through fill factors, which are used to calculate rates for unbundled network elements. For example, if 20% of a network element would be idle in an efficient, forward-looking network, the fill factor for that element is 80%. The rate for that element would be calculated by dividing the long-run cost of the element by 0.8. Thus, low fill factors will result in higher rates and higher fill factors will produce lower rates. *MPower Communications*, at 745. As the commission explained in the *UNE II Final Decision*,

> If there is a low fill factor, the network modeled will have an abundance of excess capacity and will require higher rates to recover the investment in that excess capacity. If fill factors are too high, the network modeled will not have enough capacity to handle expected growth, may be subject to more service outages, installation delays and other problems, and produce revenue from the resulting rates that would be too low to recover the cost of increasing network capacity.

*UNE II Final Decision*, at 45, 2004 WL 2590632.

Principles of the total element method dictate that the appropriate fill factors to use in determining rates for unbundled network elements are those that would "exist if SBC's network had been built using the most efficient, currently available technology." *MPower Communications*, at 746–47. The FCC has stated that fill factors need only be "reasonably accurate" estimates to comply with the total element method, *Local Competition Order*, at ¶ 682, 1996 WL 452885, and it has "accepted a wide range of fill factors as con-

sistent with TELRIC principles." *Virginia Arbitration Order* at ¶ 243, 2003 WL 22038242. In other words, state commissions have discretion to select fill factors from a range of appropriate percentages.

Before the commission, defendant SBC argued that its current actual fill factors should be used to determine the rates for its unbundled loops. The commission disagreed for two reasons. First, it stated that defendant SBC's actual fill factors "reflect[ed] SBC's embedded network," the costs of which may not be considered in setting rates for network elements. *UNE II Final Decision*, at 46, 2004 WL 2590632. Second, the commission stated that defendant SBC failed to show that an efficient, forward-looking network would contain its actual fill factors. *Id.* at 47, 2004 WL 2590632. Rather than adopting defendant SBC's actual fill factors, the commission set them as the lower boundary of a range of reasonable fill factors.

The competitive carriers argued that the commission should retain the fill factors established in the *UNE I Final Decision*. In that decision, the commission adopted defendant SBC's "target" fill factors, which represent "the maximum physical capacity of the network less the capacity required for maintenance, testing or administrative purposes," as the appropriate fill factors. SBC's Br., dkt. # 18, at 13. Although recognizing that there had not been a "significant change in law or facts" since the *UNE I Final Decision*, the commission did not retain defendant SBC's target fill factors in the *UNE II Final Decision*. Instead, it found that the parties had presented a more complete record that enabled it to "make a more reasonable estimate of appropriate fills for an efficient, forward-looking network." *UNE II Final Decision* at 49. The commission noted that defendant SBC had presented persuasive testimony that its target fills

"do not provide enough spare capacity to accommodate a reasonable projection of future growth without making expensive upgrades to its network." *Id.* at 50, 2004 WL 2590632. Therefore, it adopted fill factors that were lower than those adopted in the *UNE I Final Decision*.

■ Plaintiff attacks the propriety of the fill factors adopted by the commission in the *UNE II Final Decision* for the distribution, copper feeder and premises termination portions of defendant SBC's unbundled loops. Plt.'s Br., dkt. # 14, at 14. The distribution portion of a loop "consist[s] primarily of relatively small bundles of copper wires buried in the ground." *UNE II Final Decision*, at 51. The commission assumed a fill factor of 50% for distribution. For the copper feeder portion of a loop, which consists of "high capacity cables that link central wire centers to neighborhoods," Commissioners's Br., dkt. # 17, at 22, the commission adopted a 65% fill factor. *UNE II Final Decision*, at 52, 2004 WL 2590632. Finally, premises termination refers to the wires and other equipment used to connect individual premises to the incumbent's network. As the commission noted, this equipment "is dedicated to individual customers and for the most part must be installed on an individual customer basis." *Id.* at 56, 2004 WL 2590632. Defendant SBC and the competitive carriers submitted proposals for estimating the cost of installing this equipment. The commission concluded that SBC's proposal was more reasonable and adopted a fill factor close to defendant SBC's confidential actual fill level.

Plaintiff's challenge appears to rest on two grounds. First, the commission erred because it "endorsed" defendant SBC's current actual fill factors by including them within a range of reasonable fill factors even though those factors were calcu-

lated on the basis of defendant SBC's embedded costs and "ultimate demand." Second, the commission should have adopted fill factors proposed by SBC in a separate but contemporaneous proceeding before the commission.

Plaintiff's first argument is beyond the scope of review of unbundled network element rate determinations. This court does not have the legal authority to examine whether the commission correctly determined the boundaries for the range of reasonable fill factors; review under 47 U.S.C. § 252(e)(6) is limited to whether the rates set by the commission comply with federal law. Even if review of the commission's range of reasonable fill factors were permitted, this court lacks the technical expertise to second-guess the commission's adoption of a range of possible fill factors. So long as the commission followed total element method principles in actually choosing fill factors, its choice must be respected. A different case would be presented if the commission had acknowledged that the fill factors proposed by defendant SBC reflected defendant's embedded costs and then adopted them despite the FCC's directive that embedded costs may not be considered, 47 C.F.R. § 51.505(d)(1). In that case, a federal court could conclude that the commission had erred. But that did not occur here. The commission specifically rejected SBC's fill factors because they were too low. Whether the commission "endorsed" them by placing them at the end of a range of reasonable fill factors is irrelevant.

Further explanation is required for plaintiff's second argument, that the commission erred by not adopting fill factors proposed by defendant SBC in a contemporaneous proceeding before the commission. While the UNE II proceeding was ongoing, defendant SBC filed testimony in another proceeding before the commission that included proposed fill factors that were higher than those it proposed in the UNE II proceeding. Defendant SBC submitted these higher fill factors in the other proceeding as part of a total service long run incremental cost study. Total service long run incremental cost ("the total service method") is the pricing methodology on which the total element method was based. Defendant SBC uses total service method cost studies to set price floors for its retail services. SBC's Br., dkt. # 18, at 19–20; Commissioners's Br., dkt. # 17, at 23. Plaintiff contends that because the total element method and the total service method are similar, the fill factors used for each should be the same. Thus, the commission should have adopted the higher fill factors defendant SBC incorporated into its total service method cost study.

Defendant SBC notes that the two methods have different purposes and contends that total service method fill factors are not total element method-compliant because they account only for current demand and not for reasonably foreseeable future demand as the total element method requires. SBC's Br., dkt. # 18, at 20. Defendant commissioners argue that they chose the higher fill factors in the *UNE I Final Decision* because defendant SBC's proposed factors were unreasonable and because they were not willing to "split the difference" and choose factors between the higher fill factors and defendant SBC's proposed factors. *UNE II Final Decision*, at 50, 2004 WL 2590632. However, the parties presented a more detailed record in the UNE II proceeding, including "descriptions of how other commissions, including the FCC, were able to make a judgment about reasonable fills that were not at the upper or lower boundaries." *Id.* Because the commission had more guidance in choosing fill factors between the extremes proposed by the parties, it did not have to resort to the method it used in

the *UNE I Final Decision,* which consisted of labeling defendant SBC's proposed factors as unreasonable and adopting those on the other extreme. Plaintiff may be correct that the fill factors defendant SBC proposed in conjunction with its total service method cost study are also total element method-compliant. But this does not mean that the commission was obliged to adopt them. Application of total element method principles may produce a range of reasonable outcomes. The commission's choice of one factor rather than another does not mean it erred. Plaintiff's argument that the commission should have chosen certain fill factors misses the mark. The relevant question is whether the factors chosen were total element method-compliant. Because plaintiff has not shown that the fill factors chosen for the distribution, copper feeder and premises termination portions of defendant SBC's network do not comply with total element method principles, the commission's choices must be upheld.

Finally, plaintiff argues that the commission acted arbitrarily and capriciously by failing to give an adequate explanation for (1) its rejection of the total service method fill factors and (2) its reasons for adopting the fill factors. I disagree. The *UNE II Final Decision* contains a reasoned discussion why the commission was not constrained to choose the factors proposed by defendant SBC and the competitive carriers as it had been in the UNE I proceeding. *UNE II Final Decision,* at 49–50, 2004 WL 2590632. The commission's choice of fill factors for the distribution, copper feeder and premises termination portions of defendant SBC's network will be affirmed.

## 3. *Installation costs*

■ Plaintiff argues next that the commission improperly calculated defendant SBC's installation costs, which are part of the rate defendant charges for access to its unbundled loops. The commission adopted defendant SBC's approach for estimating installation costs (as it had in the UNE I proceeding) and rejected the approach favored by plaintiff and the other competitive carriers. *UNE II Final Decision,* at 61, 2004 WL 2590632. Defendant SBC estimated installation costs for each piece of equipment in a loop (buried, aerial, underground, fiber, copper and circuit equipment) by multiplying the cost of that piece of equipment by an installation factor, or linear loading factor. Defendant SBC calculated installation factors for each piece of equipment by dividing the non-materials costs for the piece of equipment over the years 2000–2002 by the materials costs for that piece over the same time period. In making these calculations, defendant SBC used data from its general ledgers. A consequence of defendant SBC's method for calculating installation costs is that those costs are directly proportional to the materials cost of each piece of equipment.

Plaintiff advances several reasons why defendant SBC's method for estimating installation costs violates total element method principles. In addition, it argues that linear loading factors are "inherently unreliable" because there is no linear relationship between material costs and installation costs. Plt.'s Br., dkt. # 14, at 26. Defendant SBC contends that its method for estimating installation costs is reasonable and total element method-compliant and that the commission acted within its discretion in adopting it instead of the method proposed by the competitive carriers. After reviewing the arguments, I conclude that the commission did not err in choosing defendant SBC's method for calculating installation costs instead of the competitive carriers's method.

Plaintiff argues first that linear loading factors are inconsistent with the total element method's forward-looking approach because they are calculated using historical accounting data, some of which pertains to equipment that would not appear in an efficient, forward-looking environment. It cites the testimony of Gordon Fletcher, a witness for defendant SBC, in which Fletcher indicated that defendant SBC may have installed what plaintiff characterizes as "backward-looking, inefficient equipment" in its network over the last three years. Plt.'s Br., dkt. # 14, at 27. Defendant SBC argues that although the total element method prohibits the consideration of embedded costs in setting rates for unbundled network elements, it does not prohibit the use of an incumbent's actual costs so long as they are the costs that would be incurred in an efficient, forward-looking network. Proceeding from that premise, defendant contends that its recent data provide "the best available evidence of the forward-looking relationship between material costs and installation costs." Dft. SBC's Br., dkt. # 18, at 26. It disputes plaintiff's characterization of Fletcher's testimony and notes that the FCC and the Court of Appeals for the Seventh Circuit have indicated that an incumbent's present costs can be used to estimate forward-looking costs. *AT&T Communications,* 349 F.3d at 411; *Virginia Arbitration Order* at ¶ 37 n. 103, 2003 WL 22038242.

The commission considered and rejected plaintiff's argument that defendant SBC's method relied on embedded data. It stated that the general ledger data used by defendant SBC "covered the three most recent years of activities and was not the embedded cost of SBC's network." *UNE II Final Decision,* at 60, 2004 WL 2590632. As defendant commissioners point out, the data used by SBC reflect the most recent relationship between installation costs and materials costs. The installation factors produced by this relationship, "when multiplied [by] current material costs, create[ ] forward-looking installation cost[s]." Dft. Commissioners's Br., dkt. # 17, at 28. Defendant SBC's use of general ledger data to calculate installation costs did not violate the total element method because those data are used to approximate the installation costs that would appear in an efficient, forward-looking network. Even the FCC has acknowledged that "the most efficient carrier's network will reflect a mix of new and older technology at any given time." *In re Matter of Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers,* 18 F.C.C.R. 18,945, ¶ 50, 2003 WL 22119504 (2003) ("*TELRIC NPRM*").

Plaintiff's second argument is that linear loading factors violate the total element method because they "fail to reflect economies of scale demanded" by the method. Plt.'s Br., dkt. # 14, at 28. In other words, defendant SBC's method for calculating linear loading factors are generated on the basis of small and medium-sized construction projects rather than the large projects that would be involved in constructing an efficient, forward-looking network around defendant SBC's existing wire centers. However, as defendant SBC notes, the total element method does not assume that an efficient, forward-looking network will be built at once through large-scale construction projects. *TELRIC NPRM* at ¶ 53, 2003 WL 22119504 (total element method "must be representative of the real world and should not be based on the totally hypothetical cost of a most-efficient provider building a network from scratch."). To the contrary, the FCC has recognized that the method "does not require an assumption of a perfectly com-

petitive or perfectly efficient market" and that technology may be added by carriers "over a period of time." *Virginia Arbitration Order* at ¶ 32, 2003 WL 22038242. Although defendant SBC's method for estimating installation costs assumes that small, medium and large-scale projects would be employed in constructing a forward-looking network, it does not follow that the commission erred in adopting it.

Plaintiff argues next that linear loading factors "overstate [unbundled network element] costs in higher-density service areas." Plt.'s Br., dkt. # 14, at 28. Put a different way, in areas with greater service demands, such as large cities, the equipment installed will have greater capacity and will be more expensive. Therefore, if defendant SBC uses a method for calculating installation costs in which they increase in proportion to materials costs, that method will produce higher installation costs. The commission disagreed with plaintiff, stating that "construction costs ... may actually increase in high density areas because of construction issues such as structure obstacles, congested traffic, and more municipal regulations." *UNE II Final Decision*, at 61, 2004 WL 2590632. Substantial evidence in the record supports this conclusion and it will not be disturbed. R.56: 1544.

Finally, plaintiff contends that defendant SBC failed to satisfy its burden of showing a linear, or directly proportional, relationship between materials costs and installation costs. Thus, the commission erred in adopting defendant SBC's installation factor method for calculating installation costs. In response, defendant SBC argues that it has never claimed the existence of a linear relationship between materials costs and installation costs. Rather, it argues that linear loading factors represent a reasonable and effective way to generate installation costs for each type of equipment

across its entire network. Dft. SBC's Br., dkt. # 18, at 32. On a different front, defendant commissioners point to evidence in the record suggesting the existence of a linear relationship. R.56:1548–49.

Plaintiff is correct that incumbents have the burden of showing that their proposed costs are reasonable. *Local Competition Order*, at ¶ 680, 1996 WL 452885. Moreover, the commission conceded that a linear relationship between the cost of materials and the cost of installation did not exist for every piece of equipment in defendant SBC's loops. *UNE II Final Decision*, at 61, 2004 WL 2590632 ("Although [SBC's installation factors] may not reflect an exact relationship between the materials and installation costs for any one particular project, on average, linear loading factors are a reasonable tool for estimating forward-looking installation costs."). Even if installation costs and materials costs do not rise and fall together for every piece of equipment in defendant SBC's loops, this does not mean that the use of installation factors is unreasonable. Plaintiff has pointed to no controlling authority that prohibits the use of installation factors to compute installation costs or that requires adoption of the method proposed by the competitive carriers. At present, state commissions appear to be divided in their acceptance or rejection of installation factors. Plt.'s Br., dkt. # 14, at 31; Dft. SBC's Br., dkt. # 14, at 25–26. At the very least, this indicates that SBC's approach was permissible and that the commission had the discretion to accept or reject it. The commission considered carefully the pros and cons of the two methods and chose to adopt defendant SBC's installation factors. Its decision is supported by substantial evidence in the record and is entitled to deference from this court. *Accord Mpower*, at 755.

### 4. *Cost of capital*

Incumbents are allowed to recover the costs of raising investment capital that they would incur in a competitive market through the rates they charge competitors for access to unbundled network elements. *Local Competition Order,* at ¶ 691, 1996 WL 452885 ("the forward-looking costs of capital (debt and equity) needed to support investments required to produce a given element shall be included in the forward-looking cost of that element."); *see also* 47 C.F.R. § 51.505(b)(2). As one court noted recently, the cost of capital is a "crucial input" because "it is applied as a percentage markup to the costs of all [network elements] that a competitor may obtain from an incumbent under the [Telecommunications] Act's unbundling regime." *Verizon Pennsylvania, Inc. v. Pennsylvania Public Utility Commission,* 380 F.Supp.2d 627, 635–36 (E.D.Pa.2005). An incumbent's cost of capital is the product of three inputs: the cost of debt, the cost of equity and the capital structure. In this case, plaintiff challenges only the commission's determination of the cost of equity.

■ In the *UNE I Final Decision,* the commission assumed a cost of capital of 11.25% and a cost of equity of 13%. In the UNE II proceeding, defendant SBC proposed slight increases in the cost of capital assumption (from 11.25% to 11.91%) and the cost of equity estimate (from 13% to 13.25%). The competing carriers proposed a cost of capital assumption of 7.53% with a cost of equity estimate of 9.19%. *UNE II Final Decision,* at 33, 2004 WL 2590632. The commission determined that neither side's assumptions were reasonable and decided to retain the 13% cost of equity estimate it adopted in the *UNE I Final Decision. Id.* at 34, 2002 WL 31127500. Plaintiff makes the same challenge to the commission's cost of equity determination that it made to the commission's determination of the proper ratio of integrated to universal digital loop carrier: the commission did not follow the approach established in the *Virginia Arbitration Order.* Defendant SBC contends that the commission was not obliged to follow the approach set out in the *Virginia Arbitration Order,* that the commission's approach did not violate the total element method and that its determination was supported by substantial evidence in the record. I agree with defendant's position and conclude that the commission's determination of the cost of equity estimate in the *UNE II Final Decision* is not a ground for reversal.

Plaintiff argues that, to comply with total element method principles, the commission had to calculate the cost of equity assumption by using the same approach set out in the *Virginia Arbitration Order.* According to plaintiff, the Wireline Competition Bureau approved use of the capital asset pricing model and disapproved use of the discounted cash flow model in determining a cost of equity estimate in that proceeding. Plaintiff contends that the competitive carriers's witness used the capital asset pricing model to produce a cost of equity estimate of 9.19% while defendant SBC's witness used the discounted cash flow model to generate an estimate of 13.25%. As with the integrated digital loop carrier/universal digital loop carrier ratio, plaintiff argues that the commission erred by using defendant SBC's estimate as an outer boundary.

Plaintiff is wrong on multiple fronts. First, there is nothing in the *Virginia Arbitration Order* that indicates that the capital asset pricing model is the only cost model that may be used to calculate cost of equity estimates. The Wireline Competition Bureau chose to adopt that model over the discounted cash flow model in the Virginia proceeding after noting "a number of concerns with each of the [discount-

ed cash flow] analyses presented." *Virginia Arbitration Order* at ¶ 73, 2003 WL 22038242. It stated specifically that "the [capital asset pricing model] is the better mechanism for estimating the cost of equity *in this proceeding.*" *Id.* at ¶ 71, 18 F.C.C.R. 17722 (emphasis added). In the wake of the *Virginia Arbitration Order,* carriers have continued to use versions of the discounted cash flow model to calculate cost of equity estimates. *Verizon Pennsylvania Inc.,* at 636–37 (in ratemaking proceeding, incumbent and competitor used versions of the discounted cash flow model to produce cost of equity estimates). Once again, plaintiff errs in ascribing binding authority to a decision of the FCC that did not involve an interpretation of the Telecommunications Act or the FCC's implementing regulations but rather turned on the facts adduced by the parties in that proceeding.

Second, the *UNE II Final Decision* indicates that witnesses for both defendant SBC and the competing carriers presented cost of equity estimates produced from applications of the discounted cash flow model. According to the commission, "[t]he SBC and [competing local exchange carrier] witnesses agreed that the conventional application of the constant growth form of the [discounted cash flow] model was less reliable, as that model requires stable economic and industry conditions." *UNE II Final Decision,* at 34, 2004 WL 2590632. However, the witnesses developed "multi-growth stage versions of the [discounted cash flow] model" that, in the commission's view, provided cost of equity estimates similar to those generated by the capital asset pricing model. *Id.* Third, assuming that the commission adopted defendant SBC's proposed 13.25% cost of equity estimate as an outer boundary, plaintiff has not shown that the commission committed reversible error by doing so.

After noting that the cost of equity estimates produced by each side's version of the discounted cash flow model were similar to those produced by the capital asset pricing model, the commission discussed the operation of the capital asset pricing model and noted that the witnesses disagreed primarily with only one of the inputs used in that model. *UNE II Final Decision,* at 35, 2004 WL 2590632. The commission stated that the cost of equity estimates generated by each side's use of the capital asset pricing model varied from 6.1% to 13.8%. These percentages, combined with the parties' proposed estimates of 9.19% and 13.25% and several other estimates provided by a witness for defendant SBC, gave the commission "a wide range of estimates" to choose from. *Id.* at 36, 2004 WL 2590632. In the end, the commission chose to retain the 13% cost of equity estimate it had adopted in the *UNE I Final Decision.* The record indicates that the commission considered the testimony of each side's witnesses and the various models used to produce cost of equity estimates. Also, the commission considered (but did not adopt) cost of equity estimates authorized for other entities. Plaintiff sees error in the commission's consideration of these other estimates but it has not pointed to any authority that prohibits the commission from merely *considering* other estimates. In sum, the commission's adoption of a 13% cost of equity estimate did not violate the total element method and is supported by substantial evidence in the record. Therefore, it will be affirmed.

5. *Depreciation lives*

Depreciation is the mechanism for reflecting the decline in the value of an asset over its useful life. It is one of the components used to calculate the total element long run incremental cost of a network

element. *Triennial Review Order* at ¶ 671, 2003 WL 22175730. The FCC has determined that "the depreciation rates used in calculating forward-looking economic costs of elements shall be economic depreciation rates," 47 C.F.R. § 51.505(b)(3), and that, to comply with the total element method, "the rate of depreciation over the useful life should reflect the actual decline in value that would be anticipated in the competitive market TELRIC assumes," *Triennial Review Order* at ¶ 689, 2003 WL 22175730. There are two components of depreciation: an asset's useful life, or depreciation life, and the rate at which the asset is depreciated over its useful life. *TELRIC NPRM* at ¶ 93, 2003 WL 22119504. In this case, plaintiff challenges only the depreciation lives adopted by the commission.

■ In the UNE II proceeding, defendant SBC urged the commission to adopt defendant SBC's financial lives that it uses in financial reporting to the Securities and Exchange Commission. In contrast, plaintiff and the other competing carriers argued that the commission should adopt depreciation lives prescribed by the FCC for regulatory purposes unrelated to the setting of UNE rates. *UNE II Final Decision,* at 41, 2004 WL 2590632. The FCC regulatory lives are longer than defendant SBC's financial lives and will produce lower unbundled network element rates than the financial lives. The commission rejected the proposals of defendant SBC and the competing carriers and chose to adopt depreciation lives at the mid-point of a range of lives that it had adopted for regulatory purposes pursuant to Wis. Stat. § 196.09(9). (The commission had made use of its own prescribed range of depreciation lives in the UNE I proceeding as well. In that proceeding, the commission had chosen the longest depreciation lives in the range.)

Plaintiff contends that the depreciation lives adopted by the commission for each type of equipment in defendant SBC's unbundled loops are not total element method-compliant and therefore violate the Telecommunications Act and Wisconsin law. Its burden is a heavy one; the Supreme Court and the FCC have acknowledged that state commissions have wide discretion in selecting depreciation lives. *Verizon Communications Inc.,* 535 U.S. at 519, 122 S.Ct. 1646 (recognizing that FCC "committed considerable discretion to state commissions" in choosing depreciation lives and that the total element method "recognizes no particular useful life as a basis for calculating depreciation costs"); *Triennial Review Order* at ¶ 688, 2003 WL 22175730 ("[S]tate commissions continue to have discretion with respect to the asset lives they use in calculating depreciation expense."). After reviewing the arguments, I conclude that the commission did not err in selecting depreciation lives and that its decision was not arbitrary and capricious.

Plaintiff argues first that the commission should have used the FCC's regulatory lives because the FCC has "specifically sanctioned use of its prescribed depreciation lives for [unbundled network element] pricing purposes." Plt.'s Br., dkt. # 14, at 38. Plaintiff cites *In re MATTER OF 1998 BIENNIAL REGULATORY REVIEW—REVIEW OF DEPRECIATION REQUIREMENTS FOR INCUMBENT LOCAL EXCHANGE CARRIERS,* 1999 WL 1267315, 15 F.C.C.R. 242, at ¶ 61 (1999), in which the FCC stated that "depreciation expense calculations based on the Commission's prescribed projection lives and salvage factors represent the best forward-looking estimates of depreciation lives and net salvage percentages." Also, plaintiff points to the *Virginia Arbitration Order,* in which the Wireline Com-

petition Bureau chose to adopt the FCC's prescribed depreciation lives over an incumbent's financial book depreciation lives. Plaintiff argues that the commission should have followed the Bureau's lead and adopted the FCC regulatory lives in the UNE II proceeding.

Plaintiff's argument is unpersuasive. The fact that the FCC has "specifically sanctioned" use of its regulatory lives in setting unbundled network element rates does not mean that state commissions have been deprived of discretion in choosing appropriate depreciation lives. It means only that the FCC has approved one of the choices available. In fact, the FCC has *declined* to require state commissions to use either financial lives or its regulatory lives because it has concluded that both are consistent with total element method principles. *TELRIC NPRM* at ¶ 96, 2003 WL 22119504. Plaintiff's citation to the *Virginia Arbitration Order* is unavailing because that decision was issued before the *TELRIC NPRM*. It is also misleading because the Wireline Competition Bureau did not conclude as a matter of law that the FCC's regulatory lives should be used to calculate unbundled network element rates. Instead, the Bureau adopted regulatory lives on the basis of the testimony and other evidence in that proceeding. *Virginia Arbitration Order* at ¶ 112, 2003 WL 22038242 ("*Based on the record before us,* we agree with AT & T/WorldCom that FCC regulatory lives should be used for purposes of calculating UNE prices.") (emphasis added). The *Virginia Arbitration Order* did not limit the commission's discretion. *Mpower,* at 749.

Second, plaintiff contends that the commission erred in selecting depreciation lives from its prescribed ranges because Wis. Stat. § 196.09 "was adopted long before the enactment of the Telecom [sic] Act and was never intended to produce

[total element method]-compliant economic depreciation rates contemplated by the FCC's [unbundled network element] pricing rules." Plt.'s Br., dkt. # 14, at 40. However, plaintiff points to no authority that suggests that depreciation lives must be designed with the total element method in mind in order to comply with the method. Defendant SBC's notes correctly that the FCC's regulatory lives and defendant's financial lives were not promulgated to be total element method-compliant. *Triennial Review Order* at ¶ 688, 2003 WL 22175730 ("financial lives and regulatory lives were developed for purposes other than, or in addition to, reflecting the actual useful life of an asset."). Yet the FCC has concluded that both are acceptable.

The real question is whether the commission's prescribed ranges are in fact total element method-compliant. In the *UNE II Final Decision,* at 42, 2004 WL 2590632, the commission stated that defendant SBC's financial lives, the FCC's regulatory lives and its own prescribed lives "could be considered to be compliant with TELRIC." It considered its prescribed lives total element method-compliant because they "are forward-looking lives which are reviewed by this Commission every two years." *Id.* Also, the commission noted that in setting and revising its rates, it considers trends in telecommunications technology and the rate of installation of new technologies in telecommunications networks. *Id.* at 44, 2004 WL 2590632. The commission concluded that its "biennial evaluation considers all the factors necessary to develop forward-looking lives that are reasonable to use in TELRIC cases." *Id.* I agree.

Plaintiff argues next that the information relied upon by the commission in changing the rates from those adopted in the UNE I proceeding "was the same kind of information that was 'impugned' in the

*Virginia Arbitration Order."* Plt.'s Br., dkt. # 14, at 41. Plaintiff is referring to studies conducted by Technology Futures, Inc. which were presented by a witness for defendant SBC. The studies showed that new telecommunications technology is being substituted for older technology in telephone networks at a rapid rate. A rapid rate of substitution would justify shorter depreciation lives. In the *Virginia Arbitration Order* at ¶ 118, 2003 WL 22038242, the Wireline Competition Bureau found that the competing carriers in that proceeding had "convincingly demonstrate[d] that past [Technology Futures] studies have been extremely aggressive in their projections, and that actual incumbent [carrier] retirements have proceeded at a much slower pace." However, as one court has noted, this critique does not lead inexorably to the conclusion that the commission erred in relying on the studies as a reason to adopt shorter depreciation lives in the *UNE II Final Decision. Mpower,* at 749. The commission has the discretion to accept or reject evidence presented in rate-making proceedings. Nothing in the *Virginia Arbitration Order* or any other authority cited by plaintiff indicates that the commission abused that discretion by considering the studies.

Finally, plaintiff argues that the commission failed to provide an adequate explanation for its decision to switch from the longest depreciation lives in its prescribed range to lives at the mid-point of the range. I disagree. The commission stated that it adopted shorter depreciation lives within its prescribed ranges because of evidence presented by defendant SBC indicating that telecommunications technology was changing and being replaced at a rapid rate. However, the commission noted also that the competing carriers presented evidence that defendant SBC was using some of its equipment beyond its depreciable life. This evidence tempered the degree to which the commission departed from the ranges set in the *UNE I Final Decision.* The commission's discussion of these competing pieces of evidence constitutes an adequate explanation of the reasons for its decision. In sum, plaintiff has not shown that the commission erred in its selection of depreciation lives. The commission's decision to adopt shorter depreciation lives is supported by substantial evidence in the record and the *UNE II Final Decision* contains an adequate explanation of the reasons justifying the commission's decision. Therefore, the commission's decision was not arbitrary and capricious.

### E. *Price Squeeze*

Plaintiff argues finally that the *UNE II Final Decision* should be vacated because the commission declined to comment on whether the rates it adopted harmed competition in the Wisconsin telecommunications market by creating an unlawful price squeeze between the wholesale rates defendant SBC charges competitors and the retail rates it charges customers. A price squeeze results when an incumbent sets the wholesale rates it charges to competitors so high in relation to the retail rates it charges to customers that competitors cannot compete profitably. The commission declined to address the price squeeze issue in the *UNE II Final Decision* for two reasons. First, the issue was outside the scope of the UNE II proceeding. The commission defined the UNE II proceeding as limited to the establishment of new rates for defendant SBC's unbundled loops pursuant to federal law. Because plaintiff's price squeeze argument under Wis. Stat. § 194.206 involved examination of defendant SBC's retail rates, the commission concluded that "any potential remedial action" on the price squeeze issue "must be addressed, not to SBC's wholesale offering, but to the SBC retail loop

rate." *UNE II Final Decision*, at 75, 2004 WL 2590632. Second, the commission lacked sufficient data to address the issue, specifically, information concerning (1) usage charges that affect defendant SBC's retail rate and (2) "the additional features [plaintiff] can sell to generate revenue from a leased retail SBC loop." *Id.* at 76, 2004 WL 2590632. Without information on these points, the commission did not believe it could calculate the rates necessary to determine whether a price squeeze existed.

Plaintiff argues that rates set by the commission frustrate competition in the telecommunications market in Wisconsin, thereby undermining the goals of the Telecommunications Act and Wisconsin law. It contends that its price squeeze argument is not intended to challenge defendant SBC's retail rates but rather to show how the unbundled loop rates adopted by the commission will harm competition. In support of the harmful effects of the rates, plaintiff argues that they do not pass the "imputation test" set out in Wis. Stat. § 196.204(6)(a) because they exceed the retail rates defendant SBC charges to its customers. Plt.'s Br., dkt. # 14, at 59–60.

Defendant SBC argues that whether the unbundled loop rates adopted by the commission meet the imputation requirements of Wisconsin law is irrelevant to the commission's mandate to set rates in accordance with federal law. For support, it cites the decisions of several other state utility commissions that have concluded that determining whether unbundled network element rates pass or fail state-law based imputation tests is not relevant in setting rates that are total element method-compliant. Dft. SBC's Br., dkt. # 18, at 47–48. Also, defendant SBC argues that the competing carriers did not account for all the possible revenue that could be generated from one loop, consider whether resale of defendant SBC's services would alleviate any price squeeze or demonstrate what a sufficient profit margin would be to support a competitor's entry into the market. *Id.* at 48–50.

No reported federal court decision addresses the question whether a state commission is obliged to consider a price squeeze argument during a UNE rate-setting proceeding under 47 U.S.C. § 252. Although 47 U.S.C. § 251 imposes on incumbents the duty to provide unbundled access to unbundled network elements at rates that are just, reasonable and nondiscriminatory, nothing in that section or 47 U.S.C. § 252 requires a state commission to inquire specifically whether the rates create an unlawful price squeeze. The Court of Appeals for the District of Columbia Circuit has remanded at least two decisions in which the FCC failed to consider price squeeze claims. *WorldCom, Inc. v. FCC*, 308 F.3d 1, 9–10 (D.C.Cir.2002); *Sprint Communications Co. L.P. v. FCC*, 274 F.3d 549, 554–56 (D.C.Cir.2001). However, those cases arose under 47 U.S.C. § 271, which authorizes the FCC to allow an incumbent carrier to provide long distance service in the market for which it is the primary provider of local service so long as it satisfies a checklist of fourteen conditions designed to insure that it has opened its local market up to competition. As part of that authorization, the FCC must find that allowing an incumbent carrier to offer long distance service would be consistent with the public interest. 47 U.S.C. § 271(d)(3)(C). Section 252 contains no similar requirement.

I agree with defendants that the commission did not err in declining to address plaintiff's price squeeze argument. Wis. Stat. § 196.197(3) gave the commission only 180 days to address defendant SBC's petition for new rates. Consideration of plaintiff's price squeeze argument would

have required an examination of the retail rates offered by plaintiff and defendant SBC in addition to the issues raised by defendant's petition. Moreover, the commission stated that it lacked data critical to a price squeeze analysis, including defendant SBC's monthly service charges that are added to its baseline retail rates and plaintiff's "competing offering," Dft. Commissioners' Br., dkt. # 17, at 60, as well as data concerning the additional revenues that plaintiff could generate from a single loop. Plaintiff does not argue that the commission had this information available to it and does not rebut defendants' suggestion that the information is necessary to a price squeeze analysis. Therefore, I will not disturb the commission's decision to forgo consideration of plaintiff's price squeeze claim.

## ORDER

IT IS ORDERED that the Wisconsin Public Service Commission's *UNE II Final Decision,* Docket 6720–TI–187, 2004 WL 2590632 (Oct. 13, 2004) is AFFIRMED. The clerk of court is directed to enter judgment for defendants and close this case.